John D. MARSH, Appellant,

v.

Tom GENTRY, Appellee.

Supreme Court of Kentucky.

Rendered Nov. 2, 1982.

Rehearing Denied Dec. 28, 1982.

Harry B. Miller, Jr., Miller, Griffin & Marks, P.S.C., Lexington, for appellant.

Weldon Shouse, Shouse & Burrus, Lexington, for appellee.

O'HARA, Justice.

This matter comes to this court on a direct transfer from the judgment of the Fayette Circuit Court dismissing the plaintiff's complaint. The original action grows out of an existing partnership relationship in which the appellant (plaintiff) J.D. Marsh sought an accounting by reason of sale of thoroughbred stock by the appellee (defendant) Tom Gentry to himself. The appellant alleges a conversion and actual damages. The trial court found for the defendant Gentry, and in an amended conclusions of law, deferred the issue of an accounting until an appeal could be had. We reverse on the issue of a breach of the partnership relationship and remand for proceedings consistent with this opinion.

The trial court, in a very detailed findings of fact and conclusions of law, made the following significant factual conclusions

upon which we rely for the ultimate disposition of this controversy:

1. That a partnership existed between Tom Gentry and John D. Marsh on and after November 12, 1976, which partnership had as its object buying horses and selling them and their offspring for profit.

2. The partnership assets involved in this controversy are a mare named Champagne Woman which was purchased as a partnership asset in November, 1976, for $155,000.00, and a filly which was a foal of Champagne Woman named Excitable Lady.

3. Champagne Woman was consigned to Keeneland for sale in November, 1978. Gentry never told Marsh that Gentry might bid on Champagne Woman when she was sold. Marsh did not know Gentry was going to bid on Champagne Woman at the sale.

4. On the day of the auction Gentry decided to bid on Champagne Woman, but he did not tell Marsh.

5. Although Marsh was at the sale when Champagne Woman was auctioned off for $135,000.00, he did not make any bid on Champagne Woman. Marsh did not know Gentry was bidding on Champagne Woman through his agent nor did Gentry ever tell him he was going to bid on Champagne Woman. Gentry did not tell Marsh at the auction that he had purchased Champagne Woman.

6. On September 28, 1979, Marsh wrote Gentry reminding him that Gentry had promised Marsh that he would be paid his share on the sale of Excitable Lady by August 15, 1979. Marsh thought that Gentry had sold Excitable Lady to some purchaser.

7. Marsh did not ratify the sale of Champagne Woman or Excitable Lady to Gentry.

8. Marsh did not waive any right which he had to object to the sale of Champagne Woman or Excitable Lady or to have the court impose a constructive trust for the benefit of the partnership.

The above findings were made by the trial court and, in our review of the entire record in this case, we hold that such findings are consistent with the evidence. However, the following facts were overlooked by the court, and are most significant to the sole legal issue presented in this case:

9. That it was eleven months after the November, 1978 sale of Champagne Woman before Marsh first discovered that Gentry had, in fact, purchased Champagne Woman for himself.

10. That Gentry told Marsh that the filly Excitable Lady had been sold to a third party in California and refused to furnish the name of the purchaser. Marsh consented to the sale of the filly to the California purchaser.

11. That Marsh specifically demanded in writing to know the purchaser of the filly.

12. Marsh did not know Gentry bought the filly until May, 1981, when it ran and won at Churchill Downs.

13. That Marsh would not have sold his one-half interest in either horse had he known Gentry was buying.

The controlling statute which is dispositive of this case is KRS 362.250(1), a codification of the common law passed by the legislature in 1954:

Every partner must account to the partnership for any benefit and hold as trustee for it any profit derived by him *without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its profit.*

(Emphasis added).

Applying the clear and unambiguous language of the statute to the facts of this case, it becomes instantly apparent that Gentry did not comply with the evident intent of the law when he withheld and misled his partner concerning the two "transactions" involved in this controversy.

We look first to the sale of Champagne Woman at auction in November, 1978. The actual bidding was done, by a secret agent of Gentry without the knowledge of Marsh.

In addition, when the auction was completed, the sale was listed in the name of a third party separate and distinct from Gentry or his secret agent. Every sale has as its basic elements a seller, a purchaser, and a price. Obviously the seller in this case was the Gentry/Marsh partnership. The price was established via the auction itself. As it turns out, the purchaser was Gentry himself. At no time did Gentry inform Marsh of his intentions to purchase Champagne Woman for himself and, additionally, the two covert acts surrounding the sale lend further credence to the intended "secrecy" of the purchase by Gentry. Admittedly, at an auction sale, the specific identity of a purchaser cannot be ascertained before the sale, but KRS 362.250(1) required a full disclosure by Gentry to Marsh that he would be a prospective purchaser.

As to the private sale of Excitable Lady, Gentry informed Marsh that he had a prospective purchaser in California. Marsh consented to a sale from the partnership, at a specified price, to the prospective purchaser in California. Gentry informed Marsh that a purchase would be made, and advanced to Marsh a portion of the anticipated sale price. Marsh later demanded not only the remainder of his share of the sale price, but also *the identity of the purchaser* of the filly. Gentry sent him the remainder of his money, less expenses, and informed Marsh that he would be given the identity of the purchaser at a later date.

Even though Marsh obtained the stipulated purchase price, a partner has an absolute right to know when his partner is the purchaser. Partners scrutinize buy-outs by their partners in an entirely different light than an ordinary third party sale. This distinction is vividly made without contradiction when Marsh later indicated that he would not have consented to either sale had he known that Gentry was the purchaser. Under these facts, it is obvious that Gentry failed to disclose all that he knew concerning the sales, including his desire to purchase partnership property.

■ Case law written prior to and subsequent to the adoption of the Uniform Partnership Act (KRS Chapter 362) requires partners, in their relations with other partners, to maintain a higher degree of good faith due to the partnership agreement. The requirement of full disclosure among partners as to partnership business cannot be escaped. See, e.g. *Van Hooser v. Keenon,* Ky., 271 S.W.2d 270 (1954); *Smith v. Gibson,* 310 Ky. 114, 220 S.W.2d 104 (1949); *Ehrman v. Stitzel,* 121 Ky. 751, 90 S.W. 275 (1906). Had Gentry made a full disclosure to his partner of his intentions to purchase the partnership property, Marsh would not later be heard to complain of the transaction.

■ Finally, Gentry maintains that it is an accepted practice at auction sales of thoroughbreds for one partner to secretly bid on partnership stock to accomplish a buy-out. The record, however, does not support this contention. One of Mr. Gentry's own witnesses testified that he had never engaged in that practice in twenty-seven years, and observed that it would be an honest treatment under the circumstances to provide full disclosure to his partner. In any event, the truth behind this statement is not at issue here. We would emphatically state, however, for the benefit of those engaged in such practices, that where an "accepted business practice" conflicts with existing law, the law whether statutory or court ordered, is controlling. To hold otherwise would be chaotic.

Accordingly, the judgment of the Fayette Circuit Court is reversed, and this cause is remanded to it for the entry of judgment consistent with this opinion and for further proceedings to determine the rights of the parties as adjudicated herein.

STEPHENS, C.J., and AKER, CLAYTON, O'HARA, PALMORE, STEPHENSON and STERNBERG, JJ., sitting.

Concurring Opinion by PALMORE, J.

Dissenting Opinion by STEPHENSON, J., which is joined by STERNBERG, J.

### ON REHEARING

Appellee's petition for rehearing is denied.

All concur.

AKER, J., following consideration of the petition for rehearing and the response thereto, no longer concurs in the dissenting opinion filed by STEPHENSON, J., and now concurs in the majority opinion.

PALMORE, Justice, concurring.

The common-law principle embodied in KRS 362.250(1) comes to us out of the wisdom of the ages. By requiring open dealings between partners it discourages chicanery. Compliance with it obviates lawsuits of this kind. The horse industry in this state is far too important for questionable dealing to be tolerated by the courts. If one partner deals with himself without full disclosure to and acquiescence by the other, he must do it with the understanding that any profit from it will belong to the partnership.

STEPHENSON, Justice, dissenting.

In my view the majority opinion misses the point as found by the trial court in this case.

I will divide the case into two parts, Excitable Lady and Champagne Woman, since the facts surrounding the two transactions are different.

Considering Excitable Lady the majority opinion does not set out what in my opinion are the findings of fact by the trial court that are controlling here. These findings, which are not challenged, are as follows:

"34. During the early part of August, 1979, Mr. Gentry had seen Mr. Marsh at the Saratoga yearling sales and had told him of his efforts to sell Excitable Lady. On August 20, 1979, Marsh called Mr. Gentry wanting his money on Excitable Lady. Subsequent to that Mr. Marsh called again wanting his money on the sale of Excitable Lady. *Mr. Gentry had not been able to sell the horse, but on September 7, 1979 forwarded to Marsh an advancement on the sale the sum of $62,-500. Mr. Marsh knew that the horse had not been sold when he received the $62,-500.* After paying the $62,500 to Mr. Marsh, Mr. Gentry continued in his ef-forts to sell Excitable Lady but was unsuccessful. In October 1979, Barbara Stone informed Mr. Gentry it was doubtful there would be a sale in California to that prospect.

"On September 28, 1979, Mr. Marsh wrote Mr. Gentry reminding him that Mr. Gentry had *promised* Marsh that he would be paid his share on the sale of Excitable Lady by August 15, 1979. On October 6, 1979, Mr. Gentry forwarded a check in the sum of $2,517.61 to Mr. Marsh as the balance due Marsh on the sale of Excitable Lady for the sum of $150,000. An accounting was made at that time to Mr. Marsh on the expenses of Excitable Lady. (These are a part of Defendant's Exhibit 1). Mr. Marsh thought that Mr. Gentry had sold Excitable Lady to some purchaser. After Excitable Lady won the Debutante Stakes in 1980 on Derby Day he discovered that Tom Gentry owned Excitable Lady." (Emphasis added.)

I fail to see the relevance of the additional facts the majority opinion regards as significant. This is testimony not included in the findings of fact and not necessarily overlooked by the trial court.

Here we have a case where one partner, Marsh, knowing that Excitable Lady had not been sold, demanded pay for his share and received all but a small portion of it. Later he demanded and received the balance. Marsh wanted his money whether or not the horse had been sold and in effect *demanded* that Gentry buy his share of the horse. Gentry was thus left with 100% of the horse. It was his risk from then on, and I cannot understand the thinking of the majority that concludes that KRS 362.-250(1) applies at all. The fact that Marsh thought later that Gentry had sold the horse is not relevant.

The trial court found Gentry had been unable to sell the horse; and after one partner insists the other partner buy his share, I cannot see where the partner has any further claim on what was partnership property.

The record does not support the recitation of facts in the majority opinion that Marsh consented to a sale to the prospective purchaser in California. The statement that "Gentry informed Marsh that a purchase would be made, and advanced Marsh a portion of the anticipated sale price" does not reflect the findings of the trial court that Marsh demanded his share of the price they had agreed to sell the horse for *knowing the horse had not been sold.* These findings are not shown to be clearly erroneous and further the statement "he withheld and misled his partner" (alluding to Gentry) is contrary to the unchallenged findings of the trial court.

Marsh asked for what he got and the pious statement that he would not have agreed had he known Gentry would not sell the horse smacks of infallible hindsight.

The factual situation present in the Champagne Woman transaction is different. Again, the majority opinion misses the point. The trial court made the following pertinent findings:

> "It is common practice in the action of horses for owners to bid on their own horses secretly by the use of agents. The practice of bi-bidding is an accepted practice in the horse industry. It is also common practice for owners to dissolve their partnership in horses by selling same at public auctions and to bid on partnership property. Occasionally a partner will bid on the sale of partnership property secretly through an agent. This is an accepted practice in the horse industry.

> \*   \*   \*   \*   \*   \*

> "Bi-bidding by an owner of a horse being auctioned is an accepted practice in the horse industry and occurs very frequently at horse sales.

> "30. It is not uncommon for partnerships in the horse industry to be dissolved by selling the horse at the auction sales at Keeneland or Fasig-Tipton. It is a usual custom and understanding that the partners can bid on the partnership horses being sold. A partner might or might not know of the bidding by the other partner or the partnership property."

The majority opinion states that the record does not support these findings. I had no difficulty in finding the testimony upon which the trial court based the findings. The recitation of other testimony by a witness who testified that he had never engaged in the practices is irrelevant to the findings of fact by the trial court.

Then the majority opinion arrives at the conclusion that "where accepted business practice" conflicts with existing law, the law whether statutory or court ordered is controlling." It is not argued that there is conflict. The argument is that the "accepted business practice" *waived* a civil right embodied in the statute. It is astonishing for the majority opinion to conclude that this court is proceeding to tell the Keeneland Sales how it should conduct its business, and that a business practice cannot constitute a waiver. The principle of "*waiver*" is sprinkled throughout civil law. We even approve the waiver of constitutional rights.

Further as to Champagne Woman, the majority states that Gentry misled Marsh in clear contradiction of findings by the trial court to the contrary. Again we have the pious statement by Marsh that he would not have consented if he had known Gentry was the purchaser. Marsh did sit by at the auction and see the bid falter at $60,000. Gentry's agent then bid up to $135,000, the selling price. Marsh was considerably better off financially with Gentry being the purchaser rather than if the horse had been sold off at $60,000. This illustrates the rationale of one of the witnesses who testified as to the "business practice" and testified that auction was by far the best way to dissolve a partnership for the reason the horse sold for true market value.

The Keeneland rules provide that the "right to bid is reserved for all sellers in this sale unless otherwise announced at the time of sale."

I am not aware of any principle of civil law in any of our cases that holds a civil right cannot be waived. That is the situation here.

The tenor or the majority opinion is that bad faith is present although the trial court found otherwise.

To sum up, the record reveals and the trial court found that both Marsh and Gentry were experienced horsemen, they owned, bought, and sold horses, and they attended many horse sales. They knew or are charged with knowledge of "accepted business practices at the Keeneland Sales."

The statute merely codifies the common law rules of partnership law which insure fair dealing between partners. Here the trial court found fair dealing and no advantage taken of Marsh.

The curious concurring opinion speaks of "chicanery" and "questionable dealing," none of which was found here. The trial court found no breach of good faith, and that Marsh received fair value. I do not believe we are wise enough to regulate Keeneland Sales according to a rigid and too narrow application of KRS 362.250(1).

I would affirm the trial court, accordingly I dissent.

STERNBERG, J., concurs in this dissent.